NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0350n.06

No. 09-6284

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*May 24, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| MICHAEL R. CLARK, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| WALGREEN CO., WALGREEN, DYERSBURG, | ) | COURT FOR THE WESTERN |
| TENNESSEE, aka Walgreens, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendants-Appellees. | | |

Before: BATCHELDER, Chief Judge; KEITH and ROGERS, Circuit Judges.

PER CURIAM. Michael Clark filed an action claiming violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and § 510 of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140, by his former employer, Walgreen Co. and Walgreen ("Walgreens"). Walgreens moved for summary judgment. The district court granted Walgreens' motion for summary judgment and dismissed the action. On appeal, Clark argues that the district court erred by: (1) analyzing Clark's FMLA retaliation claim pursuant to the indirect evidence method rather than the direct evidence method; (2) granting summary judgment to Walgreens on each of Clark's claims including (a) FMLA retaliation, (b) FMLA interference, and (c) a violation of ERISA. For the reasons set forth below, we AFFIRM the district court's grant of summary judgment against Clark.

1

# I. BACKGROUND

The district court aptly summarized the factual background as stated herein:

Plaintiff Michael Clark began working for Walgreens on or about December 1997. In August 2005, Clark became the manager of the Walgreens retail store located in Dyersburg, Tennessee. He served in that capacity until his discharge on or about March 8, 2007. Plaintiff took a medical leave of absence from December 8, 2006 to January 2, 2007 for a heart condition. Plaintiff did not have any additional flare ups of the heart condition after returning to work. Plaintiff's treating physician, Dr. Daniel Fearnow, released Plaintiff to return full-time to his normal duties as a Store Manger as of January 2, 2007 with a mild decrease in lifting restriction. Plaintiff disputes this contention and suggests that Dr. Fearnow placed more extensive lifting restrictions on his return to work.

After releasing Plaintiff to return to his normal duties, Dr. Fearnow did not change his opinion or ever indicate to anyone subsequently that Plaintiff was unable to perform his duties as a store manager for Walgreens. Once Plaintiff was released by Dr. Fearnow to return to his normal duties, Walgreens returned Plaintiff to the same position he held before the leave of absence, and he continued to receive the same salary and benefits and work[] the same schedule as before. Plaintiff's last direct supervisor at Walgreens was District Manager (DM) Scott McKillop. Subsequent to his return to work, Plaintiff did not call McKillop to request an additional leave of absence. Plaintiff, however, testified that he called the District Secretary and requested that McKillop call him back. In addition, Plaintiff asserts that he sent McKillop emails requesting additional leave.

On or about March 8, 2007, Plaintiff was discharged from Walgreens. Plaintiff testified that it is his belief that he was fired in retaliation for exercising rights under FMLA because he called the District Office and asked a secretary to have Mr. McKillop call him back and sent Mr. McKillop "e-mails" requesting "leave" but got no response. The Defendant, however, contends that Plaintiff was fired for falsifying training records [and learning modules], and [for] directing hourly paid assistant managers to complete their [learning modules] off of the clock.

Walgreens' employees are periodically required to complete computer-based learning modules called People Plus Learning, PPLs, and store managers have the responsibility to make sure that employees complete their assigned PPLs. [Walgreens uses PPLs to train employees on such topics] as customer service, how to operate the photo machine, and basic management skills. Walgreens' employees are also required to complete training on legal rules and regulations relating to the sale of tobacco and pharmaceuticals, among other things. The PPLs at issue here could be completed in the Dyersburg store in the training room or the main office. Both a user ID and personalized password were needed to access the system to perform PPLs. Plaintiff testified that it was a violation of Walgreens' policy to ask assistant managers or anyone to work off of the clock and or to falsify a training record.

In February 2007, McKillop received an e-mail from Sharon Messick, an hourly assistant manager in Walgreens' Dyersburg Store, who complained that Plaintiff had completed some of her PPLs and had requested that she do her PPLs on her own time, instead of during scheduled work time. McKillop then spoke to Messick over the phone and afterwards directed Loss Prevention Supervisor, LPS, Brian Anderson to go to the Dyersburg Store to investigate Messick's complaint about the Plaintiff's conduct. In addition, McKillop informed his Regional Vice-President of Messick's complaint, and the steps that were being taken to investigate it.

Anderson, the Loss Prevention Supervisor, went to Dyersburg on February 28, 2007 and interviewed Dennis Yelverton, an hourly assistant manger in the Dyersburg store, who also provided a voluntary written statement. Yelverton's statement supported Messick's complaint that Plaintiff allegedly told assistant managers to get their PPLs done even if they had to be completed on their personal time off of the clock. The following day, Anderson interviewed Messick and Judy Smith, a Beauty Advisor at the Dyersburg store, and both Messick and Smith provided voluntary written statements. Messick stated that Plaintiff did her PPLs, admitted to her that he had done her PPLs, and instructed her that PPLs needed to be done by hourly paid assistant managers off the clock if necessary. Anderson printed off a summary of Messick's completed PPLs for January and February 2007.

Messick, after reviewing the list, stated that she had only done two of the forty-four PPLs that were shown as completed. *Id.* Anderson subsequently drove to the Walgreens store in Covington and interviewed Store Manager Elise Freeman, the former Dyersburg store EXA, who also made a voluntary written statement in which she stated that Plaintiff had admitted to her that he had done PPLs for employees in the Dyersburg store and that he had told Yelverton that he could complete his PPLs on his day off at another store. Anderson did a follow up interview with Freeman a few days later, and she provided a second voluntary written statement. In the second statement, she described additional information about Plaintiff doing PPLs for employees and her concerns about his handling of the 1506 Program while she was in the Dyersburg store.

Anderson reported to McKillop the facts developed during the investigation, and McKillop spoke with his immediate supervisor, the Regional Vice President, about the investigation. The decision was made to bring Plaintiff in to the District Office. McKillop called Plaintiff and asked him to come to the Walgreens' District Office in Memphis. Plaintiff appeared at the District Office on March 8, 2007 and was interviewed by Loss Prevention Supervisors Steve Walker and Brian Anderson. Plaintiff testified that during the interview he was handed a "stack of papers" by Anderson and was asked to look at them. Anderson and Walker informed McKillop that Plaintiff admitted during the interview that he had completed PPLs for other individuals. Plaintiff, however, contends that he never made any such admission. He denies having completed the alleged PPLs and asserts that McKillop effectuated his termination due to his health issues and FMLA leave. Plaintiff did, however,

3

testify that he completed two PPLs for employees who no longer worked at Walgreens because the District Trainer said it was okay.

McKillop consulted with his Regional Vice President as well as the Employee Relations Attorney, Glenn Kaun, about the investigation, and the decision was subsequently made by McKillop to give Plaintiff the option to resign or be terminated. Plaintiff was then given the opportunity to resign in lieu of termination. Defendant alleges that Plaintiff stated that he wished to resign and wrote out a resignation letter. Plaintiff, however, strongly disagrees with this contention. Plaintiff asserts that he was provided with the opportunity to resign, but he refused. He felt that he had done nothing wrong. Furthermore, Plaintiff asserts that he was told directly by McKillop that he should resign due to his health. McKillop, however, testified that he did not make any statements concerning Plaintiff's health during the termination meeting nor did Walker or Anderson. Plaintiff was advised by McKillop that he would be able to continue his insurance through COBRA if he chose do so, and Plaintiff was given the opportunity to continue his health insurance.

On or about two weeks after Plaintiff's employment ended with Walgreens, Defendant asserts that Plaintiff called Anderson and informed him that Scott Hamblin, a Store Manager, had showed him how to do PPLs for other employees. Plaintiff, however, disputes this contention. As a result of Plaintiff's call, Anderson conducted an investigation of Hamblin, but no evidence was found to suggest that Hamblin was completing PPLs for employees.

## II. STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

4

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the moving party has carried forward this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.* The non-moving party must present significant probative evidence in support of its opposition to the motion for summary judgment. *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### III. ANALYSIS

Clark contends that his termination was actually retaliation for his usage of FMLA. Clark also asserts that Walgreens unlawfully prevented him from utilizing additional FMLA and violated his ERISA rights. The district court found no genuine issue of material fact existed sufficient to preclude summary judgment as to each of Clark's claims.

**A. FMLA Retaliation**

**1.      Direct Evidence**

To survive summary judgment, Clark must point to a genuine issue of material fact concerning his employers' motive for firing him. Specifically, he bears the burden of establishing that his employment was terminated "specifically *because* . . . [he] invoked [his] FMLA rights." *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 508 (6th Cir. 2006) (emphasis in original). FMLA annually provides twelve weeks of unpaid leave to qualified employees who suffer serious health conditions that impair their full job performance. *Daugherty v. Sajar Plastics, Inc*., 544 F.3d 696, 706 (6th Cir. 2008). Upon return from a leave, the employee is entitled to reinstatement or, in the alternative, a position offering commensurate salary and benefits. *Id.* "[A]n employer is prohibited from discriminating against employees ... who have used FMLA leave" and may not "use the taking of FMLA leave as a negative factor in employment actions." *Id.* at 706-07. Clark argues that Walgreens fired him in retaliation for his exercise of FMLA rights; that is, for having taken a FMLA leave for a heart condition. However, he has not offered "direct evidence of discrimination . . . [which] *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* at 707 (emphasis added).

Direct evidence "must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [the FMLA], but also that the employer acted on that predisposition."

*Id.* (alteration in original). Here, the allegedly offending statements, even if viewed in the light most favorable to Clark, do not compel the conclusion that Clark was fired in connection with his leave. Rather, the comments appear to address Clark's *post*-leave job performance as a function of his health. According to Clark, DM McKillop stated that "because of your health, we're just going to go ahead and terminate you." Clark, himself, interpreted the statement as an indication that he "was not healthy enough to work for Walgreen's *anymore*." (emphasis added). Clark reaches too far when he argues that that statement implied Walgreens' consideration of "potential further FMLA leave period(s) by Mr. Clark, as well as the potential expenditure of health benefits funds." McKillop's statement, even drawing all inferences in Clark's favor, does not require the conclusion that the leave prompted the firing. *Cf. Daugherty*, 544 F.3d at 708 (finding direct evidence of FMLA retaliation where a supervisor stated that an employee would be barred from reinstatement if the employee took FMLA leave). Indeed, immediately after his leave, Clark was re-appointed to the same position with the same schedule and benefits.

## 2. Indirect Evidence

FMLA retaliation claims founded upon circumstantial evidence are adjudged in accordance with the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Pursuant to the burden-shifting analysis, a plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) he engaged in protected activity, (2) he was subject to an adverse employment decision, and (3) a causal connection existed between the adverse employment action and the protected activity. *Bell v. Prefix, Inc.,* 321 F. App'x 423, 426 (6th Cir. 2009). Alternatively, a plaintiff may establish a prima facie case by demonstrating that "1) he is a member of a protected class; 2) was qualified for the job; 3) he suffered an adverse employment decision;

7

and 4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

The district court correctly held that Clark easily satisfied the test's first two prongs. The leave Clark took between December 8, 2006 and January 2, 2007 was statutorily protected, and he suffered termination in March of 2007. Further, the court correctly credited the temporal proximity of Clark's leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters. *See, e.g., Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008) ("none [of our precedents] squarely stands for the proposition that temporal proximity alone may never show a causal connection"); *McNett v. Hardin Cmty. Fed. Credit Union,* 118 F. App'x 960, 965 (6th Cir. 2004) (finding causation when "only 13 days" separated protected activity from adverse action, reasoning that an "employer's knowledge of the protected activity coupled with an adverse action occurring close in time can create an inference of causation where the particular circumstances strengthen the inference of causation"); *DiCarlo v. Potter,* 358 F.3d 408, 421 (6th Cir. 2004) (twenty-one day lapse between protected activity and adverse employer action fell within close temporal proximity); *Moore v. KUKA Welding Sys.,*171 F.3d 1073, 1080 (6th Cir. 1999) ("[t]he causal connection ... may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint [with the EEOC] and by showing that he was treated differently from other employees").

Nevertheless, the district court also correctly concluded that Walgreens proffered a legitimate, nondiscriminatory reason for firing Clark. Following an unsolicited complaint, Walgreens throughly investigated allegations that Clark not only completed PPLs for fellow

employees, but routinely directed them to complete PPLs while off the clock. Walgreens presented evidence, in the form of testimony and written statements, that Clark admitted both of these transgressions. Given this body of evidence, Walgreens harbored an "honest belief in its rationale when it reasonably relied on the particularized facts that were before it at the time the decision was made." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 599 (6th Cir. 2007). Because a reasonable juror could infer that Clark's actions violated company policy, the burden then shifted to Clark to demonstrate that Walgreens' proffered reason was pretextual.

In *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), we identified three methods by which a plaintiff may demonstrate pretext by rebutting a defendant's legitimate, nondiscriminatory reason for termination. The plaintiff may show that (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action. *Id.* Whichever method the plaintiff employs, he always bears the burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original). This Clark failed to do. Walgreens' alleged silence in response to Clark's requests for additional FMLA leave, and DM McKillop's statements about Clark's health, do not overwhelm the great weight of evidence concerning Clark's malfeasance as to PPLs. Indeed, Clark's only evidence rebutting these allegations is Clark's own vehement denial – just as Clark's only evidence that other managers engaged in similar misconduct is Clark's own testimony. Further, Clark seeks to rely upon *Bell*, which is readily distinguishable from the instant action. 321 F. App'x at 426. The plaintiff in that

9

case was terminated merely two days after engaging in protected activity, and the plaintiff's supervisor made numerous comments about the plaintiff having 'abandoned' the company. However, the Court noted that "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *Id.* at 431. Here, Clark's "other" evidence is woefully insufficient; and, therefore, no genuine issue of material fact exists as to his FMLA retaliation claim.

**B. FMLA Interference**

To establish his claim that Walgreens interfered with his right to take further FMLA leave, Clark bears the burden of showing that Walgreens "'interfere[d] with, restrain[ed], or denied [his] exercise or attempt to exercise, any right provided under [the FMLA].'" *Daugherty*, 544 F.3d at 707 (quoting 29 U.S.C. § 2615(a)(1)). In order to succeed, Clark must demonstrate that he was actually entitled to FMLA leave. *See Wysong v. Dow Chem Co.*, 503 F.3d 441, 447 (6th Cir. 2007). Moreover, uncontradicted evidence demonstrated that his doctor did not change his opinion (or communicate to Walgreens a change of opinion) regarding Clark's ability to work or allude to further work restrictions. Similar to his failure to demonstrate the existence of a genuine issue of material fact sufficient to thwart Walgreens' motion for summary judgment as to his FMLA retaliation claim, Clark also cannot establish sufficient direct evidence analysis or indirect evidence to preclude summary judgment as to his FMLA interference claim.

**C. ERISA Violation**

Clark also alleges an ERISA § 510 violation claim on the basis of the same facts he marshaled to support his FMLA claims. ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an

10

employee benefit plan.]" 29 U.S.C. § 1140. To establish a prima facie case for an ERISA § 510 violation, Clark must show: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992). However, Clark has offered no evidence to suggest that Walgreens terminated his employment to interfere with any right under any employee benefit plan. The district court therefore correctly concluded that:

> [T]he Plaintiff himself testified that no one at Walgreens ever talked to him about the cost of his health care or ever had any discussions with him about his health insurance. From Plaintiff's own testimony, the Court fails to discern how Walgreens was motivated to terminate Plaintiff due to his participation in the health insurance plan, when no one at Walgreens ever mentioned it. Even disregarding Plaintiff's own testimony, the Plaintiff fails to proffer any evidence to support the inference that Plaintiff was terminated for any reason other than a perceived violation of Walgreens policy.

## IV. CONCLUSION

Accordingly, for the foregoing reasons, the district court correctly granted Walgreens' motion for summary judgment. The district court's ruling as to Clark's FMLA retaliation claim is **AFFIRMED**. The district court's ruling as to Clark's FMLA interference claim is **AFFIRMED**. The district court's ruling on Walgreens' summary judgment motion as to Clark's § 501 ERISA violation claim is also **AFFIRMED**.