NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0206n.06

No. 16-3765

**FILED**
Apr 07, 2017
DEBORAH S. HUNT, Clerk

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JENNIFER FRAZIER, | ) | |
| Plaintiff-Appellant, | ) ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| RICHLAND PUBLIC HEALTH, fka MANSFIELD ONTARIO RICHLAND COUNTY HEALTH DEPT., and STANLEY SAALMAN, | ) ) ) ) | |
| Defendants-Appellees. | ) ) ) | |

**BEFORE: BATCHELDER, ROGERS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Jennifer Frazier appeals the grant of summary judgment to her employer, Richland Public Health, in this Title VII action claiming retaliation.[1] We **REVERSE**.

**I.**

The facts are largely undisputed. Frazier began working for Richland Public Health (RPH), a combined city/county health district, in October 2000, as a Sanitarian in training in the Environmental Health division. RPH's Health Commissioner is its highest ranking employee.

---

[1] 42 U.S.C. § 2000e–3(a). Frazier does not appeal the dismissal of her hostile-work-environment claim brought under Title VII and Ohio state law, or the dismissal of her state-law claims of civil assault, civil battery, false imprisonment, and intentional infliction of emotional distress against Defendant Saalman. The district court declined to exercise supplemental jurisdiction over the state-law claims, dismissing them without prejudice.

Defendant Stanley Saalman held that title until September 20, 2013, when he entered into a separation and release agreement with RPH under which he retired. Martin Tremmel succeeded Saalman as RPH Health Commissioner. RPH management was at all pertinent times predominantly male.

Frazier was promoted to Sanitarian I after passing an examination. In that position, her primary duties included food-service inspections, and campground and pool inspections. In January 2006, Frazier was promoted to Sanitarian III,[2] the highest Sanitarian level. She still holds that position. Frazier's involvement in mosquito control (referred to as vector control in internal RPH documents) increased when she was promoted to Sanitarian III.

---

[2] The Sanitarian III position description states:

General Statement of Duties

Administers specialized program activities in the Environmental Health Division. Conducts routine planning, educational and standard program activities associated with Environmental Health Division programs. Promotes environmental health and sanitation control through inspections and enforcement of state and local laws and regulations.

Essential Functions:

1. Consults; performs inspections; enforces regulations; reviews plans; conducts training sessions; and performs administrative tasks associated with specialized environmental programs i.e. food service operations, vending, mobile home parks, schools, camps, swimming pools, marinas, sewage disposal systems, private wells, solid waste disposal, land sludge application, environmental lead abatement and indoor air quality, or any related matters associated with these or other programs.

2. Consults, performs inspections and enforces regulations associated with various community health concerns i.e. rabies control, investigation of food-borne or other illnesses, nuisance investigations and abatement, rodent and other vector control, inspection of refuse hauling and/or sewage hauling vehicles, collecting water samples, investigations for safety hazards.

PID 398. The Sanitarian I position description states the same essential functions as does the Sanitarian III position description. *See* PID 394/Sanitarian I position description.

From 2010 until approximately July 2013, Frazier was President of AFSCME[3] Local 3469, with which RPH had a collective bargaining agreement. In January 2013, while Frazier was president, RPH employee Julie Ciesla filed a retaliation charge with the EEOC against Human Resources and Information Technology Director Rick Grega, claiming that he sexually harassed her and that she was demoted in retaliation for reporting Grega's harassment.[4] Frazier participated in the internal investigation of Ciesla's harassment complaint by serving as a witness for Ciesla. The investigator wrote in a letter to Saalman dated November 16, 2012, that he had spoken with Ciesla, Frazier, and Grega.[5] The EEOC concluded its investigation of Ciesla's charge in April 2015.

---

[3] American Federation of State, County, and Municipal Employees.

[4] Ciesla's EEOC charge stated:

I began working for [RPH] in 1998. My former job title was Human Resources Specialist. My current job title is Payroll and Fiscal Specialist.

In the Spring of 2012, I complained to management that I was sexually harassed by my supervisor, Richard Grega. No corrective action was taken. On or about November 5, 2012, Stan Saalman, Health Commissioner, told me he's sick and tired of me complaining to him and that he did not want to hear any more complaints from me. Saalman also told me that my new supervisor will be Kevin Vanmeter, Fiscal Director, and that I would no longer be reporting to Grega. On or about Nov 6, 2012, I was demoted to a position with lesser responsibilities. Vanmeter told me I would be responsible for payroll only and that I would no longer be doing Human Resources job. He also told me that I could only make future complaints to him and no one else. I believe this has a chilling effect on other females from reporting workplace harassment.

I believe I was discriminated against for participating in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

PID 459/Ciesla EEOC charge signed Jan. 9, 2013.

[5] The investigator of Ciesla's sexual harassment complaint advised Grega to remove from his office the muscle massager he had used on himself in front of Ciesla (and generally kept on

## A.  Backdrop to Saalman's Workplace Assault of Frazier in July 2013

On June 19, 2013, three female RPH employees, Beth Conrad, Sue Osborn, and Andrea Barnes, individually complained to Frazier that a video camera in the office of RPH information technology manager Phillip Nichols was aimed at the women's restroom, which was only six or seven feet away.  After Frazier verified that there was a video camera in Nichols' office so aimed, she reported it to Ciesla.  Ciesla in turn informed Health Commissioner Saalman.

By letter dated June 28, 2013, addressed to RPH's Personnel Committee from Local 3469's executive committee, of which Frazier was a member, the union complained:

> Re:  Surveillance cameras at the health department
>
> To Whom It May Concern:
>
> On June 19th, 2013, at 10:30 AM, it was discovered that a small surveillance camera located in the Computer Specialist's office was pointed at the entrance of the women's restroom across from the Registrar's office.  After a complaint was made to one of the managers, the camera was taken down at 10:45 AM. According to several employees this camera was observed to be "on" and in recording mode.  This camera is believed to have been operating from this location for some time.
>
> According to Chapter 2907.08(B) of the Ohio Revised Code,
>
> "**No person, for the purpose of sexually arousing or gratifying the person's self, shall commit trespass or otherwise surreptitiously invade the privacy of another to videotape, film, photograph, or otherwise record the other person in a state of nudity.**"
>
> Consequently, a violation of subsection (B) hereof is guilty of **voyeurism**, which is considered a misdemeanor of the second degree.  In light of the fact that there is presently an ongoing sexual harassment case against one of the managers employed at the health department [presumably, Ciesla's complaint that Grega sexually harassed her], this incident, along with the following development is particularly disturbing and could contribute to what some staff may consider a hostile workplace.

his desk in plain view), the incident that prompted Ciesla's complaint.  Grega agreed to remove the massager from his office.

With that being said, it has come to our attention the Board of Health is considering the purchase of surveillance cameras to be installed at the Health Department. The rationale explained to several employees by management was that the cameras would be used to deter child abduction from taking place on Health Department grounds.

The local chapter of AFSCME #3469 has no knowledge that any policy has been adopted regarding these surveillance cameras and would therefore like to have the following questions answered in writing regarding this issue:

- How many child abduction incidents have occurred at the local Health Department?
  . . .
- What will be the locations of each surveillance camera?
- Who will have access to the video footage of these surveillances cameras?
- Will these cameras be used for purposes besides that of security?
  . . .
- Will the video footage . . . be considered public record?
- Which managers were implicated in the incident mentioned above?
- Was there any discipline levied against any of these individuals?

**With the latest incident regarding a surveillance camera monitoring an area where there is a reasonable expectation of privacy, it is the opinion of the local bargaining unit that the staff and the public be given insight into this prospective surveillance camera system to prevent abuse and to protect the department from the threat of future litigation.**

Thank you for your consideration into this matter.

Sincerely,

The Executive Committee of Local Chapter of 3469 AFSCME

Cc:          Health Commissioner

          Department Staff

PID 430-31 (emphasis in original). This letter was distributed to Health Commissioner Saalman and all bargaining-unit employees, as well as to the individual members of RPH's Personnel Committee of the Board of Health.

**B.**

Angered by this letter, Saalman confronted Frazier as she arrived at work on the morning of July 11, 2013, called her over to the women's restroom, screamed at her repeatedly asking whether she could see the camera, shoved her inside the restroom, and blocked her access to the exit. *See* PID 1084/*Frazier v. Richland Pub. Health*, No. 2:14-cv-2735, 2016 WL 3182671, at *2–5 (S.D. Ohio June 8, 2016). Frazier reported Saalman's assaultive conduct internally to her immediate supervisor, Director of Environmental Health Matthew Work, and to Human Resources Director Grega. Frazier also reported the incident to the local Sheriff's office, on the advice of her AFSCME representative, whom she called right after the incident.[6]

Shortly after the Saalman-Frazier July 11th incident, accounts of the camera incidents were published in the local media. Central to Frazier's retaliation claim is Work's conduct following this media exposure:

> On July 18, 2013, RPH held an Environmental Health staff meeting in which Work spoke about an upcoming levy that concerned RPH's budget. Work said that "all the negative publicity from the [Mansfield] News Journal" may have an impact on the upcoming levy. He also stated that people could be laid off if the levy did not pass. Frazier believed these comments were directed at her because Work looked at her during his speech and she left the meeting crying. Frazier remained at work the rest of the day and spoke to [co-worker Sue] Osborn who told Frazier that it was not her fault and that things would get better. Helen Mitchell, an RPH secretary, also told Frazier she did the right thing by reporting the Camera Incidents. Following the meeting, Frazier went to see her primary care physician and nurse practitioner who diagnosed her with depression, anxiety, and high stress. Frazier began taking medication for her conditions and took leave from RPH under the Family Medical Leave Act ("FMLA") from July 19, 2013 to September 5, 2013.

PID 1086/*Frazier*, 2016 WL 3182671, at *7 (internal citations omitted); *see also* PID 407/Anwers to Interrogatories. Frazier's FMLA leave was six weeks long.

---

[6] *See* PID 448-50/ Richland County Sheriff's Office Incident Report.

RPH ordered an internal investigation of the July 11th Saalman-Frazier "camera incident." RPH's outside legal counsel, Fishel Hass Kim Albrecht, conducted the investigation, which included interviews of Frazier and RPH employees who witnessed the "camera incident" in and outside the women's restroom, including Sanitarian II Beth Conrad. Assistant Health Commissioner Randall's declaration, submitted in this case, averred:

> 4. I served as a director or Health Commissioner for 26 of my first 30 years of employment and then 8 years as the Assistant to the Health Commissioner at Richland Public Health. . . .
>
> 5. Because of my position as Assistant to the Health Commissioner and the location of my office, I was a part of many meetings between managers and could often hear or was a part of conversations between [RPH] managers.
>
> 6. I have personally witnessed Commissioner Stanley Saalman threaten, berate, scream at and attack female employees of [RPH].
>
> 18. Mr. Saalman blew up at Jenny Frazier on July 11, 2013 . . .
>
> 19. After the July 11 incident . . . Rick Grega, Director of Human Resources and Information Technology, said to me, "I decided that no one is to talk to Ms. Frazier, especially because she complained to the Sheriff's Department."
>
> . . . .
>
> 24. Mr. Grega was deliberately retaliating against and treating Mrs. Frazier differently for filing a complaint about the Stan incident with the sheriff. Rick Grega said to me, "He will have her job changed around to do different duties until she quits." Which is exactly what he did to Julie Ciesla who had filed a complaint about him with the state of Ohio and eventually quit.
>
> 25. [] Grega . . . and Matt Work—all managers—also remarked several times how they wanted to "get rid of Jenny, for causing trouble and complaining about management." . . .

PID 1014-16/Randall Decl.

As for Frazier's report to the local Sheriff, the City of Mansfield Law Director's Office notified Frazier in April 2014, seven months after she reported Saalman's assaultive conduct, that no charges would be brought against Saalman.

## C.

Frazier returned from FMLA leave on September 5, 2013, when the 2013 mosquito-control season was wrapping up. The season runs from when RPH first receives complaints about mosquitos, around May, to the first frost. Co-worker Sue Osborn informed Frazier that while Frazier was out on leave, her supervisory mosquito-control duties were reassigned permanently to Weston Engelbach, a Sanitarian supervisor who, like Frazier, reported directly to Matt Work. Frazier then emailed Work several times, seeking clarification of her duties and specifically asking whether he had assigned her supervisory mosquito-control duties to Engelbach permanently. Work answered none of Frazier's emails until April 2014, after more than six months had passed. His email responded simply "You will be part of the 2014 Mosquito program." PID 472, 474, 477, 478.

**History of Frazier's Mosquito-Control Duties**

As a Sanitarian I, Frazier's role in the mosquito-control program was limited to riding with the summer intern who performed the spraying and recording the mileage, i.e., when the sprayer was started and stopped. Frazier testified that when she was promoted to Sanitarian III in 2006, her role in mosquito control increased and included supervision of the mosquito-control duties of two RPH employees, Sue Osborn and Deb Britton. PID 112/Frazier dep.; PID 1087/Dist. Ct. Op.; *see also* PID 763/Engelbach dep. (testifying that when he was a Sanitarian III, Sanitarian IIIs coordinated the mosquito-control scheduling and handling of complaints).

Engelbach testified at his deposition that he and Work met in August or September 2013, at which time Work transferred to Engelbach all mosquito-control supervisory duties. As mentioned, Frazier returned from FMLA leave on September 5, 2013. Work limited Frazier's

involvement in the 2014 mosquito-control program to performing scheduling and, in 2015, Frazier had no mosquito-control duties at all. Frazier's declaration states that she had performed mosquito-control duties for nine years and that after Work took her duties away, he required Frazier to perform food-safety inspections, which she had not performed in ten years. Frazier testified that Work never explained why he took away her mosquito control duties.

### D. Frazier's EEOC Charge

Frazier filed an EEOC sex-discrimination and retaliation charge in February 2014:

I began working for [RPH] on October 1, 2000. The position that I currently hold is Sanitarian III.

On or around December of 2012, I was a witness to my co-worker's (Julie Ciesla) EEOC Charge #[redacted]. On July 11, 2013, Health Commissioner, Stan Sealman [sic], assaulted me in the workplace and I filed a complaint against him for his actions. I returned back to work from FMLA leave on or around September 5, 2013, and Director of Environmental Health, Matt Work, removed one of my programs from me (mosquito control) and assigned it to a male employee, Weston Englebach. Additionally, Mr. Work required me to start entering my own data into the computer; this duty is typically assigned to clerical staff.

I believe that I have been discriminated against due to my sex[,] female, and retaliated against for engaging in protected activity, in violation of Title VII . . .

PID 482.[7]

### E.

Frazier filed the instant action in December 2014, asserting claims of hostile work environment and retaliation under Title VII and Ohio law, and state-law claims of civil assault and battery, false imprisonment, and intentional infliction of emotional distress against Saalman. On RPH's motion for summary judgment, the district court dismissed Frazier's federal claims

---

[7] On September 26, 2014, the EEOC issued a dismissal and notice of rights to Frazier, stating that it was "unable to conclude that the information obtained establishes violations of the statutes." PID 490.

and declined to exercise supplemental jurisdiction over her state claims. Frazier appeals only the dismissal of her retaliation claim.

## II.

We review de novo the district court's grant of summary judgment. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmovant reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Title VII prohibits an employer from retaliating against an employee "because . . . [s]he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). A retaliation claim can be established by either direct or circumstantial evidence. *Laster*, 746 F.3d at 730. Because Frazier relies on circumstantial evidence, we analyze her claim under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

To establish a prima facie retaliation case, Frazier must show that 1) she engaged in protected activity, 2) her exercise of protected rights was known to RPH, 3) RPH thereafter took an adverse employment action against her or she was subjected to severe or pervasive retaliatory harassment by a supervisor, and 4) there was a causal connection between her protected activity and the adverse employment action or harassment. *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). An adverse employment action under Title VII's retaliation provision may be established by showing "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*

*& Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Laster*, 746 F.3d at 719. As the *Burlington* Court observed:

> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace.... The antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers . . . .
>
> We refer to reactions of a *reasonable* employee because we believe that the provision's standard for judging harm must be objective.

*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69 (emphasis in original).

If the employee establishes a prima facie case of retaliation, the burden of production of evidence shifts to the employer to articulate some legitimate, nondiscriminatory reason for its actions. If the employer satisfies its burden, the burden shifts back to the employee to demonstrate that the employer's proffered reason was not the true reason for the adverse employment action. *Laster*, 746 F.3d at 730. "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "require[ ] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. at 731.

**A.**

Frazier argued below that she engaged in three protected activities: participating in the Ciesla investigation of Grega, reporting Saalman's July 11, 2013 workplace assault and conduct

both internally to RPH and to the Sheriff's office,[8] and filing an EEOC charge. PID 1097. The district court agreed that Frazier's participation in the Ciesla investigation and EEOC charge constituted protected activity, but disagreed that Frazier's internal reports regarding Saalman, which preceded the filing of her EEOC charge, constituted protected activity, observing:

> Title VII does not protect Frazier's pre-EEOC charge reports regarding [] the Camera Incidents. Although Frazier alleges in the Complaint that she filed a "formal written harassment charge against Defendant Saalman," that allegation is unsubstantiated by Frazier's deposition testimony and the incident report she filed. Simply, there is nothing in the incident report or Frazier's deposition testimony which shows that her incident report was opposing a work practice prohibited by Title VII. The incident report does not even rise to the level of a "vague charge of discrimination" that the Sixth Circuit found inadequate in *Booker* [*v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)].

PID 1099-1100/*Frazier*, 2016 WL 3182671, at *10.

Viewing the facts in the light most favorable to Frazier, as we must, female employees complained to Frazier that a video camera in the office of an RPH male manager was aimed at the nearby women's restroom, and Frazier's report of the matter reached Saalman. Soon after, Frazier co-wrote the June 28 letter from the union's executive committee, which was distributed to Saalman and bargaining-unit employees. It was Frazier's reporting of the female employees' sex-based complaints and her participation in the June 28 letter that led to the July 11 Saalman-Frazier camera incident.

Further, contrary to RPH's assertion, Frazier's deposition testimony, when read as a whole, did not "concede that Saalman's interaction with her had nothing to do with her gender and everything to do with her status as Union President." Appellee Br. 28. Frazier testified that

---

[8] *See* PID 432, the Incident Report Frazier completed on July 11, 2013, which states that she called AFSCME's Ohio counsel after the incident with Saalman, and spoke to Rick Grega, RPH's Director of Human Resources and IT.

she also reported the female employees' complaints outside of union circles—to Human Resources specialist Ciesla, *a non-bargaining unit employee* who testified that she reported the matter to Saalman.

The district court incorrectly determined that the allegation that Frazier filed a "formal written harassment charge against" Saalman "is unsubstantiated by Frazier's deposition testimony and the incident report she filed."  PID 1099/*Frazier*, 2016 WL 3182671, at *10. As Frazier's deposition testimony and declaration make clear, after she sat in Grega's office and recounted the Saalman incident to Grega and others present, Grega gave her a generic "Accident/Incident Report" to complete.  The form asks for 1) "Concise description of event," 2) "Remedial action following event," and 3) "Managerial (supervisor) action to prevent re-occurrence.  When bodily injury occurs, obtain medical director comment on back."  PID 432. That is, the form Grega gave Frazier does not ask or suggest that an aggrieved employee designate the legal nature of her complaint.

Moreover, the generic "incident report" form Grega asked Frazier to complete, which she completed and signed on the day of the assaults, is replete with details of Saalman's inappropriate and assaultive workplace conduct and strongly suggests that Saalman confronted and assaulted Frazier because she took part in complaining of workplace harassment of women via the camera that was aimed at the women's restroom:

**ACCIDENT/INCIDENT REPORT**

**[date, time, employee name, place, and division completed by Frazier]**

**This is a confidential report to the department management and is to be filed with the supervisor by the end of the work day on which the event occurred**

**and with the Director of Fiscal Operations in Administration within 24 hours.**

1. **Concise description of event (continue on back).**

Walked into the main hallway at the Health Dept. to begin my work day @ 7:15 am on 7/11/13. Stan Saalman was standing in the main upstairs hallway in front of Phillip Nichol's office [where the camera at issue was] . . . I said, "Hi Stan." He said, "Jenny, come here for a second . . . I need to talk to you about something." We proceeded to walk down the hall . . . to in front of the female employees restroom. He said, "I need you to answer a question for me." Then he proceeded to open the restroom door and he said, "go in there." The female restroom was dark. He did not turn on the light. He stood there propping the door open. He said, "go in there & tell me if you can see Phillip's office." I said, "really?" I did then proceed to stand right in the doorway, not in the women's restroom and looked in the direction of Phillip's office. Stan then put both of his hands on my shoulders and pushed me back into the women's restroom. He was in my face yelling & screaming, "can you see the camera from in here?" He continued to hold my shoulders, was in my face with his, & was blocking my exit from the restroom. Had several witnesses to the event: Beth Conrad . . . They were in and/or around the plumber's office. Sue Osborn also heard Stan screaming & yelling & came into the hall to see what was going on. She said that she could see the bathroom door was propped open, but could not see Stan, could only hear him yelling, "can you see the camera from here?" She did not know who he was yelling at! She then came back to the front . . . & Helen asked, "who is Stan yelling at?" I didn't answer the question at first & proceeded to try to exit the bathroom when he put both his hands on my shoulders again, got in my face, in front of me, blocking me and said again, "answer the question!" . . . At that time I put both my hands/arms up and said, "Really Stan?["] I had an iced tea in my left hand, peanut butter sandwich in the right hand, and notebook/folder under my left arm pit. I then said, "I didn't write the letter, that it came from the Executive Board of the Union." I kept trying to leave the bathroom but he was blocking my way. I said, "look I don't know exactly what angle the camera was positioned, I haven't seen any footage, and don't know what was recorded, but the camera was pointed in this direction." At this time he had moved to allow me to exit the bathroom and we were back in [the] hall. He said, "I didn't hear anything from the union about this initially." I then told him, "I had several upset female employees come to me about the camera." . . . He said, "Well it's been removed . . . "

About a half an hour to 45 mins. later, Stan came knocking at my closed, locked office door. Sue Osborn was in my office w/me discussing the mosquito schedule for next week. I opened the door & stood in my doorway, attempting to move the conversation into the hallway because I was scared & wanted witnesses. He then proceeded to make his way in my office, pushed

the door open & hitting Sue who was standing behind it. He very rudely said to Sue, "Can you please leave?" She exited my office & he began to close my office door & Sue grabbed the door & said, "I wouldn't shut the door, she doesn't want to be in here alone with you!" He shut the door anyway. Stan said, "I just want to apologize for this morning." I shook my head no & said "no, no, that was uncalled for." He then grabbed my right shoulder and said, "No look, I am trying to apologize to you." At that point, I was becoming nervous. So I backed up to my bookshelf. He then said, "I wasn't sure who the letter was from, central AFSCME or you guys?" I said, "does that matter?" I said, "I am very upset, you pushed me into the restroom." He then said, "Oh Really!," opened my door & stormed out. My supervisor Matt Work stood in his doorway, across the hall & asked Sue who was in the hall area making copies, "what is going on?"

II. **Remedial action following event.**

I immediately told Sue Osborn what had just happened. I immediately called Eric Boyd's cell phone, AFSCME Ohio Council & Staff rep; as Union President. I explained what had happened & asked him for advice in a message. Sue Osborn called Roberta Skok from AFSCME, Regional Director & spoke with her regarding what had happened. She advised me to file a report with the Sheriff's office. She was also going to call Don Bartlett's cell phone (Pres. of Board of Health) & tell him what had happened. I then went into Rick Grega's office after he called & wanted to see me about the incident. I described the account to him, Selby Dorgan & Sue Osborn. I then called the Sheriff's dept. & dispatch said they are sending out a deputy.

III. **Managerial (supervisor) action to prevent re-occurrence. When bodily injury occurs, obtain medical comment on back.**

Rick [Grega] told Stan not to come around me or in/or around my areas of work. He filled out a slip and went home (Stan.)

PID 432-36 (emphasis in original); *see also* Frazier declaration, PID 1005-06. Sanitarian II Beth Conrad also provided a declaration averring that she witnessed part of the Frazier Saalman camera incident on July 11, 2013, provided a written and oral statement to Rick Grega, and spoke to RPH outside counsel Attorney Douglas Duckett "during the investigation performed by Central Human Resources." PID 1000.

Frazier presented sufficient evidence to raise a genuine fact issue whether her internal complaint regarding Saalman's assaultive workplace conduct constituted protected activity under Title VII; the first prima facie element of her retaliation case. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736–37 (6th Cir. 2006) (determining that because the plaintiff "reasonably believed that her actions in reporting the harassment were protected activity, she satisfies the first element of her retaliation claim"); *see also Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

## B.

Work, RPH's Human Resources Director and Frazier's immediate supervisor, who decided to greatly reduce Frazier's mosquito-control duties during the 2014 season and eliminated all such duties effective 2015, knew that Frazier had reported Saalman's workplace assault internally in July 2013. *Frazier*, 2016 WL 3182671, at *3/PID 1085. In fact, Work advised Frazier to fill out an incident report and call the Sheriff. *Id.* Frazier thus established the second prima facie element of her retaliation case.

Regarding the third prima facie element—that RPH took an adverse employment action against her by diminishing and then completely eliminating her mosquito-control duties, RPH maintains that because Frazier did not lose pay or suffer a demotion, the reassignment of her mosquito control duties was not an adverse employment action. But an adverse employment action may be established by showing "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*

*& Santa Fe Ry. Co.*, 548 U.S. at 68 (2006); *see also Laster*, 746 F.3d at 719. As the *Burlington Northern* Court observed:

> Burlington argues that a reassignment of duties cannot constitute retaliatory discrimination where, as here, both the former and present duties fall within the same job description. We do not see why that is so. Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable. That is presumably why the EEOC has consistently found "[r]etaliatory work assignments" to be a classic and "widely recognized" example of "forbidden retaliation." 2 EEOC 1991 Manual § 614.7, pp. 614–31 to 614–32; see also 1972 Reference Manual § 495.2 (noting Commission decision involving an employer's ordering an employee "to do an unpleasant work assignment in retaliation" for filing racial discrimination complaint); Dec. No. 74–77, CCH EEOC Decisions (1983) ¶ 6417 (1974) ("Employers have been enjoined" under Title VII "from imposing unpleasant work assignments upon an employee for filing charges").

*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 70–71.

Work took away Frazier's mosquito control duties and responsibilities, which she had performed for nine years, and reassigned her largely to food inspections, which she had not performed in more than ten years. RPH management required Frazier to take several refresher food-inspection courses. Frazier presented the declaration of RPH Assistant Commissioner Randall, submitted in this case, who averred that Grega and Work remarked in his presence several times that they wanted to "get rid of Jenny [Frazier], for causing trouble and complaining about management," and that Grega said he "will have her job changed around to do different duties until she quits." PID 1015-16/Randall Decl. Thus, a genuine issue of fact remained regarding whether the reassignment of Frazier's duties that occurred here might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 70–71.

Frazier also presented evidence sufficient to survive summary judgment regarding the fourth prima facie element of her retaliation case—that a causal connection existed between her protected activity, internally reporting the July 11, 2013 camera incident, and the drastic diminution and eventual abolishment of her mosquito-control duties. Frazier internally complained and reported to the Sheriff's deputy the Saalman incidents on July 11, 2013. Engelbach testified that Work assigned supervision of the mosquito-control program to him in August or September 2013 and Sue Osborn's declaration averred that around "August 29, 2013, the clerical staff, including myself, had a meeting . . . During the course of this meeting the mosquito control program was brought up. Matt Work said, 'Wes Engelbach has been given all the duties Jenny [Frazier] was responsible for from here on out. Wes is in charge.'" PID 1013. Thus, less than six weeks passed between Frazier's protected activity of reporting Saalman's workplace assault and conduct to her superiors at RPH and Work's reassignment of Frazier's mosquito-control duties to Engelbach on August 29, 2013, when Frazier was out on FMLA leave. But Frazier was scheduled to return from leave days later, in early September.

This court has held that the causal connection between the protected activity and the adverse employment action necessary for a prima facie case of retaliation can be established solely on the basis of close temporal proximity. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."). This court has determined that a two to three month period between protected activity and adverse employment action was sufficient to establish a causal connection. *Clark v. Walgreen*

*Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) ("[T]he court correctly credited the temporal proximity [two months] of [the plaintiff's] leave and his firing as sufficient evidence of a causal connection between the two. Our precedents stand for the principle that timing matters."); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (three months between the plaintiff's request for FMLA leave and her termination on the day she was scheduled to return to work sufficed to establish causal connection at prima facie stage).

Contrary to the district court's determination, Frazier presented evidence sufficient to create a genuine issue of fact regarding whether she established a prima facie case of retaliation. *See Whitfield v. Tenn.*, 639 F.3d 253, 260 (6th Cir. 2011).

## C.

RPH maintains that even if Frazier established a prima facie case, it is still entitled to summary judgment because Frazier cannot demonstrate that the reason her mosquito-control duties were eliminated was a pretext for retaliation. Because the district court did not reach the issue of pretext, we leave it to the district court to address it in the first instance on remand.

For the reasons stated, we REVERSE the district court's grant of summary judgment.