NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0252n.06
Filed: April 2, 2009

**Nos. 07-2059, 07-2484**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JONATHAN BELL,                             )
                                           )
    Plaintiff-Appellant,               )
                                           )  On Appeal from the United States
v.                                         )  District Court for the Eastern
                                           )  District of Michigan
PREFIX, INCORPORATED,                      )
                                           )
    Defendant-Appellee.                )

Before: BOGGS, Chief Judge; and COLE and COOK, Circuit Judges.

BOGGS, Chief Judge: On August 8, 2005, Prefix, Inc., terminated Jonathan Bell. Bell sued under the Family and Medical Leave Act (FMLA), claiming that he was discharged in retaliation for leaves of absence he had recently taken to care for his dying father. The district court granted summary judgment for Prefix, and Bell appeals. We reverse because Bell has made a prima facie case of unlawful discrimination and has produced enough evidence for a reasonable jury to conclude that he was terminated because of his FMLA leave.

I

Prefix builds models and prototypes for the automotive industry. Bell's employment history reflects the significant economic problems that Prefix, like many companies connected to the automotive industry, has recently faced. After hiring Bell as a model maker in August 2003, Prefix

laid him off in November 2004 for economic reasons, and it formally terminated him a month later. Prefix rehired Bell in February 2005 after business again picked up.

By July 2005, Prefix was in trouble again. Major clients, including GM, Ford, and Chrysler, had complained about the quality and timing of Prefix's work. Furthermore, most departments were over budget, including the model department. On July 13, 2005, Prefix hired a new general manager, Philip Serra, to reverse the company's fortunes and increase profits. Serra quickly determined that Prefix was overstaffed, and he began terminating employees almost immediately. The terminations appear to have been made on an ad hoc basis, and they continued for almost a year. Although the record does not specify how many employees were ultimately terminated, Bell's department was eventually reduced from six employees to one.

Prefix's renewed business problems coincided with a deterioration in the health of Bell's father. In mid-July 2005, doctors discovered that Bell's father had an aortic aneurism. He was hospitalized on July 22, 2005, and surgery was scheduled for July 23, 2005.

Because of Bell's father's age and the seriousness of his condition, the family chose to appoint patient advocates with power of attorney to make medical decisions. They decided that Gregory, one of Bell's brothers, would be the primary patient advocate and that Bell would be the secondary patient advocate, with the power to act when Gregory was not present. Bell and Gregory also agreed to ensure that one of them was always available to go to the hospital.

Before his father was hospitalized, Bell told Jimmy Turner, his immediate supervisor, and Daniel Closs, Turner's supervisor, that he would periodically need to take some time off to care for his sick father. Both gave their approval, and Closs notified Serra. Ultimately, Bell took FMLA

2

leave on four days: July 22, July 23, July 26, and August 6. On each of these days, Gregory was not available to go to the hospital, and Bell received permission to miss work. Bell also missed a full day of work on July 29 for a previously scheduled personal vacation with his fiancée.

The details of Bell's FMLA absences are:

On Friday, July 22, 2005, Turner allowed Bell to leave at 1:00 p.m. so that Bell could visit his father before the surgery. At the hospital, Bell spoke with his father's physicians about the details of the operation and then discussed the procedure with his father. Bell's father was nervous and scared, so Bell comforted him, telling him that everything would be all right.

On Saturday, July 23, 2005, Bell worked overtime in the morning but left early to visit his father, who was in the intensive care unit after the operation. Bell again comforted his father and assured him that everything would be all right. Bell's father could not speak because of a breathing apparatus, but he squeezed Bell's hand and could identify various family members who were also present.

On Tuesday, July 26, 2005, Bell received an emergency call from the hospital at approximately 10:30 a.m. His father's condition had worsened, and it was urgent that a family member come to the hospital. The hospital could not reach Gregory, so Bell asked Turner if he could leave immediately. However, Turner requested that Bell stay till noon because it was a particularly busy day, and Bell agreed. Serra had ordered pizza for the employees that day, and Bell took some before he left. Bell states that Serra, despite knowing that Bell was leaving to visit his dying father, then "became enraged and belittled [Bell] in front of Jim Turner and other employees for abandoning [Prefix] when there was work to be done."

3

While at the hospital on July 26, Bell discussed potential treatments with his father's doctors. He also visited his father and spoke with him. However, his father was unresponsive and could not effectively communicate with anyone.

On Saturday, August 6, 2005, Bell did not go to work; he had arranged on Friday to have the day off. While he was at the hospital, Bell spoke with his father's physicians and authorized a bronchial biopsy and a venous catheterization for his father.

In addition to his FMLA leave, Bell went to the hospital after work most days. During those visits, Bell further discussed his father's condition with the doctors and with his family, and he authorized various medical procedures. Bell continued to go to the hospital until his father's death on August 14, 2005.

On Monday, August 8, 2005, Serra told Close that he planned to terminate Bell. Serra and Close discussed the fact that "[t]he attitude that [Bell] has taken probably is a little laxidasical [sic], and the work load was very high and the progress was a little slow." Serra also noted that "everybody" should be working more hours. Serra then called Bell into his office and fired him.

Serra claims that Bell's FMLA leave did not influence his decision to terminate Bell. Rather, "[i]t was strictly an issue of we were over budget in the model area and we didn't need to have the numbers of people we had in there to do the work that was available."

On November 9, 2005, Bell filed a suit for retaliatory discharge in the United States District Court for the Eastern District of Michigan. After a failed motion for dismissal, Prefix moved for summary judgment on September 8, 2006. In response, Bell filed affidavits by himself, his two brothers, his mother, and Turner, and he argued that these affidavits established genuine issues for

trial. The district court disagreed, and it granted summary judgment for Prefix on July 23, 2007. The court held that although Bell established a prima facie case of intentional discrimination, Prefix had offered a legitimate, nondiscriminatory reason for Bell's termination—a desire to increase profits—and Bell had not produced any evidence of pretext. Bell appeals.

## II

This court reviews a district court's grant of summary judgment de novo. *Thomas v. Miller*, 489 F.3d 293, 297 (6th Cir. 2008). Summary judgment is appropriate only if a reasonable jury could not return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this question, we review the entire record, accepting the non-movant's evidence as true and drawing all reasonable inferences in its favor. *Id.* at 255.

## III

To survive summary judgment, Bell must produce enough evidence to allow a reasonable jury to find that his FMLA leave was a "motivating factor" in Prefix's decision to terminate him. *See Gibson v. City of Louisville*, 336 F.3d 511, 514 (6th Cir. 2003). Because Bell does not have direct evidence of unlawful retaliation, we evaluate his claim under the three-step *McDonnell Douglas* burden-shifting framework. *See Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007). First, Bell must make a prima facie case of unlawful retaliation. If he succeeds, Prefix must offer a legitimate, nondiscriminatory reason for Bell's termination. If Prefix does so, Bell must then show that the proffered reason is pretextual. *Ibid.* We address each step in turn.

## A

Establishing a prima facie case of discriminatory intent is not difficult: Bell must merely present some evidence of "circumstances which give rise to an inference of unlawful discrimination." *Ibid.* (internal quotation marks omitted). Bell may do this by showing that (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there was a minimal causal connection between the adverse employment action and the protected activity. *Ibid.* (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

Bell has made a prima facie case. His termination was an adverse employment action, and the close temporal proximity between Bell's leave and his termination in this case suffices for the showing of causal connection necessary at this stage of the inquiry. *See Skrjanc*, 272 F.3d at 314.

Prefix argues that Bell did not engage in protected conduct because he did not "care" for his dying father as required by the FMLA. *See* 29 U.S.C. § 2612(a)(1)(C) (2006). This argument fails. An employee may "care" for a sick family member in a number of ways, including by: providing physical care; providing "psychological comfort and reassurance"; discussing the family member's medical condition and treatment with doctors; and authorizing medical procedures. *See* 29 C.F.R. § 825.116; FMLA-94, Op. Dep't Labor (1998). Additionally, employees can provide care even if they are only "filling in" for the primary caregiver. 29 C.F.R. § 825.116.

Bell has presented evidence of conduct that qualifies as "care" under even the narrowest understanding of the term. According to Bell's description of his visits to the hospital, he was intimately involved with his father's medical treatment. Bell states that on July 22, July 26, and August 6, he discussed his father's condition and treatment with doctors. He also states that on August 6 he authorized medical procedures. Furthermore, by reassuring his father and telling him

6

that everything would be all right, Bell provided psychological care on July 22 and 23. This conclusion is reinforced by Bell's involvement in his father's treatment on days he did not take FMLA leave.

To the extent Prefix merely disputes Bell's version of events, this is an issue for trial. Prefix does argue, however, that we should disregard Bell's summary judgment affidavits, which contain almost all of Bell's evidence on this point. Prefix claims that the affidavits are improper because they were submitted after discovery closed. However, Fed. R. Civ. P. 56(c) explicitly allows the non-movant to file affidavits in response to a summary judgment motion, regardless of whether discovery has closed. *Bilyeu v. Metro. Gov. of Nashville &Davidson County*, 136 F. App'x 786, 788 (6th Cir. 2005) (per curiam); *see also* Fed. R. Civ. P. 6(c)(2) (stating that any affidavit opposing a motion must be filed at least one day before the hearing).

Prefix also asserts that the affidavits are improper because they contradict the affiants' deposition testimony. However, our thorough review of the affidavits and the depositions reveals nothing that rises to the level of contradiction. While the affidavits are more detailed than the deposition testimony on many points, they merely expand on areas that were left open or were underdeveloped in the deposition. Therefore, the affidavits were proper and we consider them.

B

Because Bell has established a prima facie case, the burden shifts to Prefix to produce evidence of a legitimate, nondiscriminatory reason for Bell's termination. In its brief, Prefix states that "Bell's termination was the result of a lack of work in his department and Prefix's goal to increase profit." In his deposition, Serra explained that he terminated Bell because he believed

Prefix had more employees in the model department than were necessary. He also stated that Bell's

FMLA leave played no role in his decision. Given Prefix's economic problems and the relatively

contemporaneous termination of a number of other employees throughout the company, we interpret

these statements as a claim that Bell was terminated as part of a reduction in force (RIF).[1] *See*

*Schram v. Schwan's Sales Enters., Inc.*, 124 F. App'x 380, 384 (6th Cir. 2005) ("A work force

reduction situation occurs when business considerations cause an employer to eliminate one or more

positions within the company." (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.

1990)).

Viewing Bell's termination as part of an RIF exposes a flaw in Prefix's stated reason: it does

not specify why Bell, rather than another employee in the modeling department, was terminated. In

other areas of employment discrimination law, we have required employers to explain "why [the

plaintiff] was chosen as the object of the reduction in force." *Taylor v. Union Inst.*, 30 F. App'x 443,

448 (6th Cir. 2002) (per curiam) (race and gender discrimination); *Tye v. Board of Educ. of the*

*Polaris Joint Vocational Sch. Dist.*, 811 F.2d 315, 318 (6th Cir. 1987) (sex discrimination),

*abrogated on other grounds as recognized by Kline v. TVA*, 128 F.3d 337, 343-44 (6th Cir. 1997);

*Smith v. Allstate Ins. Co.*, 195 F. App'x 389, 395 (6th Cir. 2006) (race, sex, and age discrimination);

*see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981) (stating, in a gender

discrimination case, that the employer must "produc[e] evidence that the plaintiff was rejected, or

---

[1]Bell argues that a desire to increase profits is not a legitimate, nondiscriminatory reason because employers "could always cite the desire to earn larger profits as a reason for not complying with the [FMLA]." This concern is misplaced, as any abuse is addressed at the pretext stage of the inquiry. More importantly, this argument is foreclosed by this court's precedent, which has held that RIFs are legitimate, nondiscriminatory reasons for adverse employment decisions. *E.g.*, *Taylor v. Union Inst.*, 30 F. App'x 443, 452–53 (6th Cir. 2002) (per curiam)

someone else was preferred, for a legitimate, nondiscriminatory reason"). We see no reason to distinguish FMLA claims on this issue.[2] Just as Bell must demonstrate that *he* suffered an adverse employment action, so too must Prefix provide a legitimate, nondiscriminatory reason specific to *that* action.

Despite its failure to explain in its filings why Bell was chosen to be dismissed as part of the RIF, Prefix's burden of production is satisfied if evidence of a sufficiently specific reason can be found in the record. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–10, 522–23 (1993). Here, the record shows that Bell had been rehired from a lay-off five months before his termination, and that Serra and Close believed Bell was a slow worker with a lackadaisical attitude. These are facially adequate reasons for Bell's inclusion in the RIF, and we hold that Prefix has met its burden.[3]

C

Thus, Bell must produce enough evidence to allow a reasonable jury to conclude that Prefix's proffered reason—that Bell was legitimately included in a genuine RIF—is pretextual, and that his FMLA leave influenced Prefix's decision to terminate him. He makes three alternative arguments:

---

[2]We often rely on other employment discrimination law to fill the gaps in our FMLA case law. *See, e.g.*, *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696 (6th Cir. 2008) (relying extensively on ADA, ADEA, and Title VII cases); *Bryson*, 498 F.3d 561 (same); *see also Hoffman v. Prof'l Med Team*, 394 F.3d 414, 422 (6th Cir. 2005) (observing that FMLA retaliation claims use the same analytical framework as Title VII retaliation claims).

[3]As a matter of logic, the employer's legitimate, nondiscriminatory reason must explain not only the decision to terminate a particular employee, but also the timing of the termination. However, this is rarely an issue. In most RIF cases, the RIF is subject to a formal plan that dictates the timing of terminations. This case is different because employees were terminated on apparently random occasions over an extended period of time, and there is no specific evidence about why Bell was fired when he was. Nonetheless, if the jury believes that the RIF was genuine and that the reasons for including Bell in the RIF were nondiscriminatory, it could reasonably conclude—even absent specific evidence—that the timing was not motivated by Bell's FMLA leave. This is, of course, only a statement about Prefix's burden of production, and Bell can try to show that the timing of his termination was influenced by his FMLA leave.

first, he argues that there was no genuine RIF; second, he argues that even if there was a genuine RIF, he was not included; and third, he argues that even if he was included in a genuine RIF, his inclusion was not legitimate.

1

Bell argues that there was no genuine RIF because Prefix's asserted motives for the RIF—lack of work and increased profits—were not authentic. Bell reasons that Prefix could not have actually desired increased profits because it was profitable in July and August 2005.[4] This claim fails as a matter of logic and of evidence. A profitable company may of course want to be more profitable. And Bell has produced no evidence suggesting either that Prefix did not want to be more profitable or that it did not believe that the RIF (or Bell's inclusion) would make it more profitable. In fact, the record amply demonstrates the opposite.

Bell also argues that there was no "lack of work." He claims that, at the time of his discharge, Prefix had work for at least six months, even if new orders were not being received, and that employees were required to work significant amounts of overtime. Bell appears to misunderstand Prefix's "lack of work" explanation. Serra's deposition testimony demonstrates that he believed there was a "lack of work" in the sense that Prefix had more employees in Bell's department than were necessary to do the available work. *See, e.g.*, J.A. 523–26 ("We were

---

[4]Bell requests access to Prefix's financial records in an attempt to further support this argument. During discovery, Prefix refused to disclose its records, and Bell filed a motion to show cause. However, the district court denied the motion because Bell failed to certify that he had tried in good faith to confer with Prefix. Bell took no further action on the matter, and the district court rejected his argument at summary judgment that he should be given additional discovery time. Bell has not shown why this court should excuse his failure to act during discovery. Furthermore, we doubt that financial records could reasonably suggest that Prefix did not want to increase profits.

overstaffed in [Bell's] department so yes, there was a lack of work. . . . [W]e didn't need to have the numbers of people we had in there to do the work that was available.").[5] Thus, the amount of work Prefix had is irrelevant: it has no bearing on whether Prefix genuinely believed that it could do that work with fewer employees. Bell has produced no evidence suggesting that Prefix did not believe that it had more employees than it needed, and the record, again, amply demonstrates the opposite.

2

Bell also argues that, even if there was a genuine RIF, he was not included as a matter of law because he was replaced by other employees. We have previously explained that

> [a]n employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Schram*, 124 F. App'x at 384 (quoting *Barnes*, 896 F.2d at 1465). Although multiple individuals, at various times, performed Bell's duties after his termination, Bell has provided no evidence that one or more employees actually replaced him. While the record is admittedly unclear on this point, it appears that these individuals merely performed some aspects of Bell's duties on a temporary

---

[5]In its brief, Prefix claims that Bell was terminated because of "a lack of work in his department and Prefix's goal to increase profit." Yet, a few pages later, Prefix states that the reason for Bell's termination was "not a lack of work, but an ability to make do with less [sic] employees." This contradicts the plain meaning of Serra's explanation. Nonetheless, confusion over the use—or misuse—of the phrase "lack of work" is irrelevant. Whatever the label, the record shows that the underlying reasoning given by Prefix's management—a desire to perform the same work with fewer employees—is legitimate, genuine, and constant over time.

11

basis. This conclusion is reinforced by the fact that within a year, the modeling department was reduced from six employees to one.

3

Finally, Bell argues that even if he was terminated as part of a genuine RIF, any specific reason for his inclusion is pretextual because his FMLA leave was the real reason for his termination. Although the issue is close, a reasonable jury could conclude, based on the collective strength of five pieces of evidence, that Prefix had a discriminatory motive in terminating Bell.

First, the pizza incident suggests that Serra did not respect Bell's FMLA rights and viewed his leave as harmful to the company.[6] According to Bell, Serra raised his voice and accused him of "abandoning" Prefix when there was work to be done, even though Serra knew that the only reason Bell was leaving was to care for his dying father. A reasonable jury that believes Bell's version of events could conclude that Serra's hostility towards Bell was based on his FMLA leave, and that this FMLA-based hostility influenced Serra's decision to terminate Bell.

Second, while discussing Bell's termination with Closs, Serra remarked that "everyone" needed to work more hours. While facially general, a reasonable jury could conclude that the context suggests animosity towards Bell's protected leave, particularly in light of the fact that the primary reason Bell was not working more hours was his FMLA leave.

---

[6]Prefix claims that this argument is not preserved for appeal because Bell did not argue, at the summary judgment stage, that the pizza incident showed discriminatory intent. However, we review the record as a whole, and the fact that Bell's filings fail to point out relevant evidence or draw reasonable conclusions does not preclude us from doing so. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Evidence of the incident was included in the affidavits Bell attached to his responses to Prefix's motion to dismiss and to its motion for summary judgment. Therefore, the evidence is properly in the record, and we may consider it.

Third, a jury could view Serra's and Closs's comments about Bell's slow work habits and lackadaisical attitude as pretextual because they are decisively contradicted by Bell's only formal evaluation and by Turner's affidavit. Although the evaluation was from 2003, it was very positive. For example, on a scale of zero to fifteen, Bell's quality of work was rated a twelve, which corresponds to "[f]requently produces high-quality work; makes few errors." And Bell's quantity of work was rated a fifteen, which corresponds to "[c]onsistently exceeds productivity requirements; consistently completes work ahead of schedule; highest level of output." Furthermore, Turner, Bell's immediate supervisor, attests that Bell had "excellent work habits, skills and motivation."

Fourth, Bell was terminated two days after a protected absence and two weeks after he began taking leave. Although temporal proximity alone is insufficient to satisfy Bell's burden at this stage of the inquiry, "suspicious timing is a strong indicator of pretext when accompanied by some other, independent evidence." *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393–94 (6th Cir. 2005).

Fifth, Prefix does not appear to have adopted a formal structure for its RIF or used any objective process or criteria in selecting employees for inclusion. Rather, Serra appears to have discharged whomever he liked whenever he liked. This supports a finding of pretext because the RIF's discretionary nature provided an opportunity for discriminatory intent to influence Serra's decisions. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 534 (6th Cir. 2007).

While it is a close question, a reasonable jury could view this evidence collectively and conclude that Bell's FMLA leave was a motivating factor in his inclusion in the RIF. Bell need not specifically negate every one of Prefix's nondiscriminatory reasons for including him in the RIF; if

a reasonable jury believes that his FMLA leave actually motivated–at least in part–his termination, then any claim that his termination was nondiscriminatory is necessarily pretextual.  Therefore, Bell has carried his burden.

IV

For the reasons set out above, a reasonable jury could find for Bell.  The district court's grant of summary judgment is therefore REVERSED.