NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0472n.06

Case No. 23-1834

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| CARLA CAMPBELL-JACKSON, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| STATE FARM INSURANCE, | ) | |
| Defendant-Appellee. | ) | O P I N I O N |
| | ) | |

Before: WHITE, STRANCH, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Dr. Carla Campbell-Jackson sued her former employer, State Farm Insurance ("State Farm"), for race discrimination under federal and state law after the company fired her following a lengthy tenure with the insurer. After a partial dismissal of Campbell-Jackson's complaint, she was left with two claims: one for hostile work environment and one for retaliatory discharge. After discovery closed, State Farm filed a motion for summary judgment as to these claims, which the district court granted. On appeal, Campbell-Jackson challenges the earlier partial dismissal as well as the court's entry of summary judgment in State Farm's favor. For the following reasons, we affirm the district court's dismissal of Campbell-Jackson's race-based termination claim, but we reverse as to her hostile work-environment and retaliation claims.

I.

*Background.* Campbell-Jackson is an African American woman, who worked for State Farm for nearly thirty years. Campbell-Jackson's career at the company was marked by steady

progress along a path of increasing responsibility and status. Throughout her tenure, she held various managerial positions, consistently earned positive performance evaluations, and received multiple promotions. In addition to these professional achievements, Campbell-Jackson also earned several insurance-related certifications and received repeated recommendations for various company awards for her exemplary performance.

In September 2014, Campbell-Jackson transferred to State Farm's Special Investigative Unit ("SIU") as a claims manager responsible for vetting customers' insurance claims for fraud at the company's Kalamazoo, Michigan office. According to Campbell-Jackson, while in this role, she observed a trend in which State Farm employees regularly denied insurance claims filed by African American and other minority customers. (Appellant Br. 11, 24). Over the span of about two years, Campbell-Jackson frequently reported to management this concern as well as instances of alleged discriminatory conduct against State Farm's minority employees. During this time, at least one State Farm employee described Campbell-Jackson and her repeated complaints as a "continual problem" at the company. (R. 111-33, PageID 1303).

In September 2015, about a year after transferring to the SIU, Campbell-Jackson received a mid-year performance rating of "average"—an appreciably lower score than she had typically received. Campbell-Jackson believed that she had received this unfavorable rating in response to her outspokenness about State Farm's discriminatory conduct, and she said so to the company's Vice President of Human Resources, Rich Garcia. In response, Garcia asked Campbell-Jackson to send him information that would demonstrate that her most recent evaluation did not reflect her actual job performance.

On January 20, 2016, Campbell-Jackson followed up by sending Garcia an email containing 50 electronic document attachments that she believed conveyed her strong

2

performance. She also sent a blind copy of the Garcia email to her personal email address. The email attachments primarily included compliments from co-workers, business reports, and performance memoranda. The attachments also included a claim file that contained the name and social security number of a State Farm vendor—something Campbell-Jackson says she did not realize when she sent the email.

Campbell-Jackson's inadvertent transfer of the vendor's data to her personal email address triggered a data loss prevention warning that alerted Celeste Dodson, Campbell-Jackson's direct supervisor, that Campbell-Jackson had transmitted "sensitive personal information" ("SPI") outside of the organization. Dodson immediately reported this warning up the chain of command, and State Farm assigned Kelly Park, an employee relations investigator, to investigate the data breach.

By March 2016, this investigation confirmed that Campbell-Jackson had transmitted one item of sensitive personal information and five documents that had been marked as "Internal Use Only" or "Confidential" to her personal email address when emailing Garcia on January 19 and 20, 2016. (R. 111-47, PageID 1354). It also found that she had sent eleven emails "identified as Internal Use Only or Confidential in nature" to external email addresses between December 1, 2014, and February 3, 2016. (R.111-47, PageID 1355–56). Additionally, the investigation revealed that Campbell-Jackson regularly exchanged numerous other communications between her work email address and other external email addresses. So much so, that Park estimated that about 94 percent of emails exchanged with Campbell-Jackson's email address "appeared to be personal correspondence." (*Id.* at PageID 1353). Even though Campbell-Jackson's excessive emailing practices potentially violated company policy, State Farm did not discuss the matter with her or issue any disciplinary action at that time.

On April 25, 2016, an unidentified person mailed copies of a letter addressed to State Farm's president, Campbell-Jackson, and certain of the company's "Hispanish [sic], Muslims, Blacks, and [] Minorities" employees located at its Kalamazoo office. The letter contained racially offensive and derogatory language, including statements such as "Hispanish [sic] are lazy" and "Blacks are uneducated (maybe one or two exceptions) and Muslims are at the bottom of the barrel with the Hispanish [sic]."

When Campbell-Jackson received the letter, she retrieved other copies that were in the mailroom and alerted co-workers to whom the letters were also addressed about the incident. Campbell-Jackson then contacted Dodson and Garcia to inform them of her actions. Campbell-Jackson was not met with the positive reception she expected. Instead, Garcia admonished Campbell-Jackson, stating that retrieving the letters was "not [her] job," (R. 111-1, PageID 922), and instructed her to "hold tight" while State Farm addressed the situation. (R. 105-2, PageID 720-21) Similarly, Dodson instructed Campbell-Jackson to "let HR handle [the] matter" and to "stay in [her] lane." (R. 111-1, PageID 922-23).

About two weeks after the letter incident, on May 9, 2016, Garcia, Park, and Kelly Bever, Vice President of Operations, scheduled a meeting with Campbell-Jackson to discuss her email activity and ultimately terminate her employment. At the meeting, State Farm provided Campbell-Jackson with a portion of the investigation findings regarding her email usage. Campbell-Jackson acknowledged the report's findings, explained that she sometimes sent work-related items to her personal account out of convenience so she could work on them from home, stated that she knew of other employees who had engaged in similar behavior, and apologized for sending SPI information to her personal email account "if that created a concern." (R. 111-53, PageID 1380-

83). At the close of the meeting, Garcia informed Campbell-Jackson that it was in State Farm's best interest that she and the company "part ways." (R. 111-1, PageID 934).

*Procedural History.* Campbell-Jackson filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), identifying "race" and "retaliation" as the basis of her discrimination complaint. The particulars of the charge read as follows:

> I began working for the above-named employer on or about July 1, 1988, and was last employed as a Section Manager.
>
> Beginning in September of 2014, I began making complaints to Human Resources and my Manager that our company was discriminating against minority employees and customers. Following my complaints, I received the lowest performance rating in my twenty-eight year career with the company. My previous performance ratings had always been stellar.
>
> On April 25, 2016, I and several other minority employees received an anonymous, racist letter to our home and workplace addresses. I, again, complained to my manager and to Human Resources. On May 9, 2016, I was discharged for allegedly sharing sensitive personal information in two email communications. There was no sensitive personal information in those communications and, even if there were, employees are not discharged for this oversight.
>
> I believe I, and others, have been harassed because of our race, African American, and I was discharged due to my opposition of what I believed to be unlawful employment practices, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(R. 4-2, PageID 62).

The EEOC investigated the complaint and, in February 2021, issued its determination letter, which concluded that Campbell-Jackson had viable Title VII claims for harassment (hostile work environment) and retaliation. Campbell-Jackson received a right-to-sue letter on September 16, 2021, and filed this lawsuit on December 9, 2021. Relevant here, Campbell-Jackson's complaint alleged that State Farm (1) terminated her because of her race; (2) subjected her to a

hostile work environment; and (3) retaliated against her for reporting and complaining about State Farm's allegedly discriminatory behavior.[1]

State Farm moved to dismiss Campbell-Jackson's complaint, arguing, among other things, that certain of her Title VII claims were barred because she failed to raise them in her EEOC charge. The district court agreed and dismissed Campbell-Jackson's race-based termination claim. The district court also narrowed the scope of Campbell-Jackson's hostile-work-environment claim to the events surrounding her receipt of the April 25 letter, based on its conclusion that the April 25 letter was the only factual instance of racial harassment she had included in her EEOC charge. Campbell-Jackson's retaliatory discharge claim proceeded as initially pleaded.

Subsequently, in its motion for summary judgment, State Farm construed the district court's previous dismissal order as narrowing both Campbell-Jackson's hostile-work-environment claim and her retaliation claim to the circumstances surrounding her receipt of the April 25 letter— even though the district court had not disposed of any portion of the latter claim. State Farm argued, in part, that Campbell-Jackson could not establish a prima facie case for either claim. Campbell-Jackson did not challenge State Farm's framing of her retaliation claim. Instead, she argued that her complaints about the April 25 letter were protected activity and that the temporal proximity between these complaints and her termination established the necessary causal connection to meet her prima facie burden for her retaliation claim.

First, accepting that Campbell-Jackson had "identifie[d] her complaints about the April 25 letter as her protected conduct," for purposes of her retaliation claim, (R. 136, PageID 1827), the district court determined that Campbell-Jackson failed to show the necessary causal connection between her reports about this incident and her termination. Second, the district court found that

---

[1] Campbell-Jackson's complaint also included state law claims, which she later conceded were time-barred.

Campbell-Jackson's hostile-work-environment claim also failed because the undisputed evidence showed that State Farm's response to the letter was reasonably calculated to end such harassing behavior. Given these reasons, the district court granted summary judgment in State Farm's favor. This appeal followed.

## II.

On appeal, Campbell-Jackson challenges the district court's (1) dismissal of her claim that she was terminated based on race; (2) narrowing of her hostile work environment claim to the events related to the April 25 letter and subsequent grant of summary judgment; and (3) grant of summary judgment as to her retaliation claim. We address these arguments in turn.

### A. Motion to Dismiss—Discriminatory Discharge and Harassment

Campbell-Jackson argues that the district court improperly determined that she failed to exhaust administrative remedies for her claims that State Farm (1) terminated her employment because of her race and (2) subjected her to a hostile work environment beyond her receipt of the April 25 letter.

We review de novo a district court's partial dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. *Willman v. U.S. Att'y Gen.*, 972 F.3d 819, 822 (6th Cir. 2020). To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Coley v. Lucas Cnty.*, 799 F.3d 530, 537 (6th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

*Exhaustion.* Before filing a lawsuit in federal court, a Title VII plaintiff must exhaust her administrative remedies by timely filing a charge of discrimination with the EEOC and receiving a right-to-sue letter. *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018). "The charge must be 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) (quoting 29 C.F.R. § 1601.12(b)). "The purpose of the requirement is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004). Thus, "[a]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [her] EEOC charge." *Younis*, 610 F.3d at 361. This rule requiring administrative exhaustion "is not meant to be overly rigid, nor should it result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006) (internal quotations omitted). Such leeway stems from the fact that "aggrieved employees—and not attorneys—usually file charges with the EEOC." *Younis*, 610 F.3d 359 at 362. As such, "their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Id*. We have referred to this principle as the "expected scope of investigation test." *Dixon*, 392, F.3d at 217 (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002)); *accord Spengler v. Worthington Cylinders*, 615 F.3d 481, 490 (6th Cir. 2010) (same). Under this test, the "determinative inquiry" is whether Campbell-Jackson "alleged sufficient facts in [her] EEOC Complaint to put the EEOC on notice" of her claims that State Farm

terminated her because of her race and subjected her to harassment beyond its actions relating to the April 25 letter. *Dixon*, 392 F.3d at 217. We answer no to the former and yes to the latter.

*Termination Based on Race*. Campbell-Jackson first argues that she exhausted her claim that State Farm terminated her based on race because she checked the boxes marked "race" and "retaliation" on her EEOC charge form and provided particulars regarding those experiences in the form's narrative section. According to Campbell-Jackson, these general references to race discrimination necessarily encompassed a race-based termination claim and were sufficient to prompt the EEOC to investigate the allegation. We disagree.

Campbell-Jackson specifically alleged in her EEOC charge that she was "discharged due to [her] opposition of what [she] believed to be unlawful employment practices." She offered no other factual allegations to suggest or imply that, in addition to firing her for reporting purportedly racially discriminatory practices, State Farm also fired her because of her race. While she accurately points out that she marked "race" as the type of discrimination that she suffered, this one-issue EEOC claim does not cover all possible forms of race discrimination in the workplace. *See Golden v. Mirabile Inv. Corp.*, 724 F. App'x 441, 445–46 (6th Cir. 2018) (finding that published circuit caselaw does not permit the allowance of "any generic one-issue EEOC claim to cover all other forms of discrimination in the workplace"). Instead, Campbell-Jackson's race discrimination claim is better understood as alleging that she experienced racially harassing actions that created a hostile work environment. Indeed, she directly articulated as much in her charge: "I believe I, and others, have been harassed because of our race[.]" That Campbell-Jackson may have experienced harassment because of her race does not mean that she was terminated because of race. *Cf. Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545–46 (6th Cir. 1991), *abrogated on other grounds by Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006) (providing that the scope of a

plaintiff's national origin discrimination claim did not "automatically expand due to his membership in more than one minority group"). Thus, without more, Campbell-Jackson's charge was insufficient to place the EEOC on notice that she was claiming race-based termination. As such, the district court properly dismissed this claim for failure to exhaust.

*Scope of Hostile Work Environment Claim.* Campbell-Jackson next argues that the district court erred when it limited the scope of her harassment claim to the events surrounding the April 25 letter. Citing her complaint, she argues that her allegations of State Farm's discriminatory conduct span the course of multiple years and that the district court's imposition of an artificial cut-off date improperly excluded relevant evidence supporting her case. We agree.

On the EEOC charge form, Campbell-Jackson lists the "dates of discrimination" as having taken place from September 1, 2014, through May 9, 2016. And in the form's narrative section, she adds that, "[b]eginning in September of 2014, [she] began making complaints to Human Resources and [her] Manager that [State Farm] was discriminating against minority employees and customers." She alleges that following these reports, she received "the lowest performance rating in [her] twenty-eight year career with the company." Campbell-Jackson's mention of this date range, her repeated complaints to company management, and the unsatisfactory performance review she received following these complaints support her contention that her EEOC charge complained of discriminatory conduct beyond the allegations regarding the April 25 letter. Under the "expected scope of investigation test," these allegations were sufficient to prompt the EEOC to investigate her harassment claim not only in relation to the offending letter, but also relating to events "[b]eginning in September of 2014." (R. 4-2, PageID 62). Campbell-Jackson therefore properly exhausted this claim.

State Farm resists this conclusion. First, it insists that the other allegations of harassment, unrelated to the April 25 letter, served as mere background information for Campbell-Jackson's retaliation claim and otherwise fail to allege that she personally experienced harassment. Second, State Farm argues that the EEOC determination letter makes clear that the April 25 letter was the only instance of harassment that the agency investigated, and thus cabins her claim to that event. Neither contention is persuasive. To begin, we have long rejected a "myopic view of harassment" that limits such claims "only to those things that are 'directed at or witnessed by'" a particular plaintiff. *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 718 (6th Cir. 2012) (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 659-60 (6th Cir. 1999)). As such, Campbell-Jackson's secondhand knowledge of discriminatory conduct in the workplace *can* support a hostile work environment claim. *See Jackson*, 191 F.3d at 661 ("Indeed, the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment.") (internal quotations and citation omitted). Moreover, State Farm offers scant reasoning as to why Campbell-Jackson's earlier complaints must solely be considered as "background" information rather than factual allegations of harassment, and we discern no reason for doing so here. State Farm cites *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460 (6th Cir. 1998) for support. But *Davis* lends no support for the company's argument. In *Davis*, the court found that the plaintiff had failed to exhaust her age discrimination claim because she did not identify age as a potential cause of discrimination in her EEOC charge and instead specifically listed race and retaliation as the basis of her complaint. *Id.* at 463–65. We are confronted with no such circumstances here. And the EEOC's limiting of its investigation to the April 25 letter is not dispositive. The question we ask is whether the agency was on notice of a particular claim—not whether its investigation considered all aspects of it. *See Dixon*, 392 F.3d

at 219 ("The Court is not prepared to penalize [plaintiff] because the EEOC investigation should have been broader in scope."). Campbell-Jackson's charge provided sufficient notice of her harassment claim and her complaint adequately set forth a claim encompassing purportedly harassing activity between 2014 and 2016. As such, we find that the district court erred when it cabined Campbell-Jackson's harassment claim to the events relating to the April 25 letter. And its grant of summary judgment based on the circumstances of that singular event was therefore premature.[2]

### B. Retaliation—Summary Judgment

Campbell-Jackson next argues that the district court wrongly granted State Farm summary judgment as to her retaliation claim. We review the grant of summary judgment de novo. *Smith v. City of Troy*, 874 F.3d 938, 943 (6th Cir. 2017). We will affirm the district court's grant of summary judgment if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The nonmoving party may survive summary judgment only by presenting "sufficient evidence to permit a reasonable jury to find in its favor." *Willard v. Hunting Ford, Inc.*, 952 F.3d 795, 805 (6th Cir. 2020) (quoting *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014)). The court "must view all of the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in the nonmoving party's favor." *Id.* at 805–06.

Because Campbell-Jackson seeks to prove her retaliation claim with circumstantial, rather than direct, evidence, we analyze her claims under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–07 (1973). Under this framework,

---

[2] We are not confronted with and therefore express no opinion concerning the question of whether Campbell-Jackson's hostile environment claim can survive Rule 56(a) scrutiny when the evidence that was excluded from consideration by the district court's limitation on the scope of the claim is taken into account.

Campbell-Jackson carries the initial burden of establishing a prima facie case for retaliation. *Id.* at 802. If she can do so, then the burden shifts to State Farm to "articulate some legitimate, non-discriminatory reason for its actions." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Once State Farm satisfies its burden, then Campbell-Jackson may still succeed if she can show that State Farm's offered reason was a mere pretext. *McDonnell Douglas*, 411 U.S. at 804–05. "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

*Prima Facie Retaliation.* To establish a prima facie case for retaliation under Title VII, Campbell-Jackson must demonstrate that "(1) [she] engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by [State Farm]; (3) thereafter, [State Farm] took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730 (internal quotations omitted). The parties do not dispute satisfaction of the first three elements. We therefore move directly to the fourth element: causation. Campbell-Jackson asserts that the temporal proximity between her complaints about the April 25 letter and her firing is sufficient to establish causality. We agree.

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). "In such cases, the adverse employment action is often taken just days or weeks from when the employer learns

of the employee's protected activity." *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020). Because Campbell-Jackson was terminated only about two weeks after she complained about the April 25 letter and no other employment action occurred in that timeframe, she can arguably establish causality on this basis alone. *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 776–77 (6th Cir. 2018) (finding that a roughly two-month period between the employee's protected activity and the material adverse event was, alone, "sufficient temporal proximity to establish a causal connection"); *see also Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283–84 (6th Cir. 2012) (collecting cases that hold similarly).

State Farm argues that Campbell-Jackson cannot rely on temporal proximity to establish causation because it was contemplating terminating her as early as January 2016 when it initiated the investigation into her email usage—long before the circulation of the April 25 letter. We have recognized that an employer's decision to proceed "along lines previously contemplated, though not yet definitively determined," provides no evidence of causality. *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 507 (6th Cir. 2014) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam)). But State Farm offers no evidence to show that it had ever contemplated firing Campbell-Jackson before she complained about the April 25 letter. In fact, evidence in the record arguably cuts in the opposite direction. Garcia testified that his involvement between April 26, 2016 and May 9, 2016,—a time period immediately following Campbell-Jackson's complaints—included working with "the leadership team" as the team "formed their recommendation" to terminate Campbell-Jackson. (R. 111-4, PageID 971). Although State Farm points to its prior investigation of Campbell-Jackson, the existence of an investigation, and even one that finds wrongdoing, does not suffice here to show that State Farm was merely "proceeding along lines previously contemplated" when it fired Campbell-Jackson. *Montell*, 757 F.3d at 507

(quoting *Breeden*, 532 U.S. at 272). In *Montell*, the employer had taken multiple steps down the path to potential termination; it had documented Montell's poor performance through a performance improvement plan, provided oral counseling and a development plan, and issued both a "Final Warning" and an "Amended Final Warning" that set a timeframe for Montell to demonstrate improvement or face termination. *Id.* at 507-08. Yet, taken together, these steps were insufficient to overcome the close temporal proximity between protected activity and termination when the employer altered the timeline for dismissal. *Id.* Here, a reasonable juror could find that State Farm took no such concrete steps before Campbell-Jackson's protected activity, and that State Farm's first step showing the contemplation of termination was the day after the April 25 letter's circulation. Thus, even if we assume, as State Farm has posited, that Campbell-Jackson forfeited her argument that "other evidence" buttresses her causation claim, State Farm has not defeated Campbell-Jackson's showing of causation based on temporal proximity. She has met her prima facie burden.

This conclusion, of course, does not settle the matter because State Farm has produced evidence of a legitimate, nondiscriminatory reason for terminating Campbell-Jackson: violation of company policies. Specifically, State Farm argues that it fired Campbell-Jackson because her email activity violated several of its policies. Campbell-Jackson's email usage undisputedly violated State Farm's computer security and privacy policies, and the company has a legitimate interest in enforcing its own policies. These policies also apply to all State Farm employees, making this explanation neutral on its face. State Farm adds that Campbell-Jackson's transfer of SPI was an especially serious violation and that other, similarly situated employees had also been terminated for email misuse. The company, therefore, satisfied its burden of production in this regard.

*Pretext*. It thus becomes Campbell-Jackson's burden to show that State Farm's explanation is a mere pretext, which she successfully does here.

Typically, a plaintiff may establish pretext by proving that an employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the adverse employment action or (3) are insufficient to motivate discharge. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012). "But these are not the only ways that a plaintiff can establish pretext[.]" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020). Rather, these methods are merely "a convenient way" to answer the "ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Tingle v. Arbors at Hillard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Chen*, 580 F.3d at 400 n.4.). To answer this question, a plaintiff need only present "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her." *Chen*, 580 F.3d at 400. We have previously observed that "[t]his burden is not heavy." *See Youngstown*, 966 F.3d at 462.

Campbell-Jackson does not dispute that her email activity violated company policy; rather, she contends that State Farm's failure to discipline her sooner shows that the company did not actually terminate her for this reason. According to Campbell-Jackson, the evidence shows that State Farm waited for the opportune time to use her email usage as a cloak to conceal its retaliatory motives after she complained about the April 25 letter. In support, Campbell-Jackson points to a March 3, 2016, email in which Park relays that she has "completed a review of" Campbell-Jackson's emails and provides Garcia and others with a comprehensive breakdown of Campbell-Jackson's email activity. (R. 111-47, PageID 1353-56). This evidence, Campbell-Jackson posits, shows that State Farm concluded its investigation into her email activity as early as March 3, 2016. Yet even though the investigation revealed the extent of her policy violations, State Farm took no

disciplinary action against her until over two months later—a mere two weeks after she complained about the April 25 letter. The prolonged delay between State Farm's discovery of her policy violations and her termination, Campbell-Jackson argues, undercuts the company's proffered reason for its adverse employment action. A reasonable juror could agree.

Consider the sequence of events. The record shows that State Farm opened its investigation into Campbell-Jackson's email activity in January 2016. Viewing the facts in the light most favorable to Campbell-Jackson, Park's March 3 email marked the end of the investigation. State Farm insists that Park's pulling of Campbell-Jackson's training records in April showed that the investigation continued. Regardless, in early March the investigation confirmed Campbell-Jackson's transfer of SPI and revealed other improper email activity, but State Farm did nothing in the immediate aftermath of these findings. It did not notify Campbell-Jackson of its findings; it did not admonish her to refrain from such activity; it did not issue any discipline; and it did not terminate her employment. Then, months later and only two weeks after Campbell-Jackson spoke out about the racist letter, the company fired her. A juror could reasonably determine State Farm's failure to issue any corrective action sooner, combined with the "suspicious timing" of Campbell-Jackson's termination, *Hale v. ABF Freight Sys. Inc.*, 503 F. App'x 323, 335 (6th Cir. 2012) (quoting *Bell v. Prefix, Inc.*, 321 Fed. App'x 423, 431 (6th Cir. 2009)), is sufficient to conclude that the company's stated reason for terminating her position is pretextual. *See Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 516 (6th Cir. 2021) (noting that temporal proximity accompanied by other independent evidence is "a strong indicator of pretext" (quoting *Seeger*, 681 F.3d at 285)). At the summary judgment stage, that is all that is required. Accordingly, Campbell-Jackson's claim for retaliation survives.

III.

For the foregoing reasons, we AFFIRM the district court's dismissal of Campbell-Jackson's race-based termination claim, REVERSE its dismissal of her hostile work environment claim, REVERSE its grant of summary judgment on her retaliation claim, and REMAND the case for further proceedings consistent with this opinion.